UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 22-137 (KMM/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) PLEA AGREEMENT AND |
| | ) SENTENCING STIPULATIONS |
| (1) JAMES CLAYTON WOLF, | ) |
| Defendant. | ) |

The parties to this case hereby agree to its resolution on the following terms and conditions. This plea agreement binds only the defendant and the United States Attorney for the District of Minnesota and does not bind any other United States Attorney's Office or any other federal or state agency. The United States is represented by Andrew M. Luger, United States Attorney for the District of Minnesota, and Robert M. Lewis, Quinn Askew, and Craig R. Baune, Assistant United States Attorneys. The defendant, JAMES CLAYTON WOLF, is represented by Paul Engh and David Hashmall, Esqs.

1. **Charge.** The defendant agrees to plead guilty to Count 1 of the Superseding Indictment, charging wire fraud in violation of 18 U.S.C. § 1343. The defendant is pleading guilty because he is guilty of this charge.

2. **Dismissal of Charges.** If the defendant pleads guilty to Count 1 and otherwise complies with this agreement, at the time of sentencing the government will move to dismiss the remaining counts against the defendant in the Superseding Indictment.

3. **Factual Basis.** The defendant agrees that the following facts are true and correct and would be proven at trial beyond a reasonable doubt:

James Clayton Wolf ("WOLF" or "the defendant") was certified as an organic farmer in Minnesota between at least 2014 until 2020. WOLF held himself out as an organic farmer and marketed grains as organic that were not in fact organically grown. WOLF did not hold a grain buyer license or organic handlers certificate as required by law to engage in the brokering of grain.

From not later than January 2013 through at least January 2021, WOLF engaged in a scheme to defraud by selling crops he purchased from third parties that were not organic, but he misrepresented the crops as organic to the buyer. WOLF knew that it was a material fact to the buyer whether the crops were in fact organic.

WOLF used means of interstate wire communication, including by telephone and e-mail, as part of and in furtherance of the scheme. For example, WOLF routinely emailed buyers documentation falsely describing the grain as organically grown.

WOLF's financial gain from the scheme was $19,673,794. With some of the proceeds, WOLF purchased land and personal property and made financial investments. All of the property listed as forfeitable in the Superseding Indictment is proceeds traceable to the scheme and the offense alleged in Count 1 to which WOLF is pleading guilty.

On or about November 13, 2018, in the State and District of Minnesota and elsewhere, the defendant,

**JAMES CLAYTON WOLF,**

having devised the scheme and artifice to defraud described above, did knowingly and intentionally transmit and cause to be transmitted by means of wire communication in interstate commerce, writings for the purpose of executing such scheme and artifice, that is, WOLF sent an email from Minnesota to an organic purchaser in Pennsylvania attaching an invoice for "organic corn" that WOLF then and there well knew was false because the product was not organic corn, all in violation of Title 18, United States Code, Section 1343.

4. **Statutory Penalties.** The defendant understands that the offense to which he is pleading guilty carries the following maximum statutory penalties:

2

    a.    a term of imprisonment of up to twenty (20) years;

    b.    a criminal fine of up to $250,000.00 or twice the gain or loss from the offense, whichever is greater;

    c.    a term of supervised release of up to three (3) years;

    d.    a $100 special assessment, due at sentencing; and

    e.    the costs of prosecution.

5. **Revocation of Supervised Release.** The Defendant understands that if the Defendant were to violate any supervised release condition while on supervised release, the Court could revoke the Defendant's supervised release, and the Defendant could be sentenced to an additional term of imprisonment up to the statutory maximum set forth in 18 U.S.C. § 3583(e)(3). *See* U.S.S.G. §§ 7B1.4, 7B1.5. The Defendant also understands that as part of any revocation, the Court may include a requirement that the Defendant be placed on an additional term of supervised release after imprisonment, as set forth in 18 U.S.C. § 3583(h).

6. **Guideline Calculations.** The parties acknowledge that the defendant will be sentenced in accordance with 18 U.S.C. § 3551 *et seq.* Nothing in this agreement shall be construed to limit the parties from presenting any and all relevant evidence to the Court at sentencing. The parties also acknowledge that the Court will consider the United States Sentencing Guidelines in determining the appropriate sentence and stipulate to the following advisory Guidelines calculations:

    a.    The base offense level is 7, U.S.S.G. § 2B1.1(a)(1);

    b.    The parties agree that the loss as defined in U.S.S.G. § 2B1.1 cannot reasonably be determined in this case, and therefore the defendant's gain shall be used as an alternative measure of loss. The gain was $19,673,794. Therefore, 20 levels are added to the base offense level. U.S.S.G. § 2B1.1(b)(1)(K).

3

c. The parties agree that no other enhancements or adjustments apply, except the parties agree the total offense level should be adjusted downward two levels pursuant to U.S.S.G. § 3E1.1(a) if the defendant pleads guilty and admits all relevant conduct for which he is accountable.

d. If the defendant (1) testifies truthfully during the change of plea and sentencing hearings, (2) pays the $100 special assessment upon sentencing, (3) complies with all conditions of pretrial release, (4) cooperates fully during the presentence report, including any asset investigation, and (5) commits no other acts inconsistent with acceptance of responsibility, including but not limited to committing new crimes, the government will recommend that defendant receive an additional one-level reduction for acceptance of responsibility at the time of sentencing pursuant to U.S.S.G. § 3E1.1(b).

e. Based on the foregoing, the total offense level is expected to be twenty-four (24).

7. **Criminal History Category.** The parties believe that the defendant's Criminal History Category is I. If the defendant's Criminal History Category as computed at the time of sentencing is different than I, the parties may not withdraw from the plea agreement.

8. **Advisory Guidelines Ranges.** With a total adjusted offense level of 24 and Criminal History Category I, the resulting advisory Guideline range is 51-63 months' imprisonment with an advisory fine between $20,000 and $200,000 or twice the gain or loss from the offense, whichever is greater. The parties are not bound to request a sentence within the advisory Guidelines range and may argue for any sentence available under law.

9. **Potential New Zero-Point Offender Guidelines Provision Under U.S.S.G. § 4C1.1.** The Court must apply the sentencing Guidelines

Manual in effect as of the date of sentencing. U.S.S.G. § 1B1.11(a). However, the U.S. Sentencing Commission recently proposed a new provision of the United States Sentencing Guidelines that will call for a 2-level downward adjustment for defendants with zero criminal history points under some circumstances. Specifically, the proposed provision, § 4C1.1, would provide a decrease of 2 levels from the offense level determined under Chapters Two and Three if the defendant meets all of the following criteria: (1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848. The Sentencing Commission has published this new provision for retroactivity consideration.

The proposed new provision will not take effect — if at all — until November 1, 2023. If the defendant is sentenced after the new provision takes effect, the parties believe he will qualify for the 0-Point Offender Adjustment under § 4C1.1. With that reduction, the defendant's total offense level would be 22, and the Criminal History Category is I, resulting in a Guidelines range of 41 to 51 months' imprisonment.

If the defendant is sentenced before November 1, 2023, the defendant may seek a variance from his otherwise-applicable Guidelines range based on the proposed U.S.S.G. § 4C1.1. The government agrees to support the variance and to ask the Court to sentence the defendant as if U.S.S.G. § 4C1.1 had taken effect on the express condition that the defendant agrees that he will not later seek, by any means, including through a motion pursuant to 18 U.S.C. § 3582(c), a further reduced sentence on the basis that the new § 4C1.1 was inapplicable at the time his sentence was imposed, even if the proposed version of § 4C1.1 is made retroactive. This provision will not apply if, between now and the date of sentencing, the proposed amendments are rejected by proper authority or withdrawn by the U.S. Sentencing Commission.

10. **Discretion of the Court.** The Guideline stipulations, although binding on the parties, are not binding on the Court. The Court has the sole discretion to determine the appropriate guideline range and the parties understand and agree that, if the Court determines that different sentencing factors or calculations apply

6

to defendant's offense other than those set forth in this agreement, neither party may withdraw from this agreement.

11. **Restitution.** The parties agree that the Mandatory Victim Restitution Act does not apply because, as set forth in 18 U.S.C. § 3663A(c)(3)(b), determining complex issues of fact related to the cause or amount of victim losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. If any victims are identified by the time of sentencing or within the time limits permitted by law in which to identify victim losses, the defendant understands that the Court will order him to pay restitution pursuant to 18 U.S.C. §§ 3663-3664A. The defendant agrees that any restitution ordered shall be due and payable immediately after the judgment is entered and is subject to immediate enforcement, in full, by the United States. If the Court imposes a schedule of payments, defendant agrees that the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full.

The defendant will fully disclose to the United States Attorney's Office the existence and location of any assets in which the defendant has any right, title, or interest which shall include all assets held in defendant's own name or in the name of another including those held by spouse, nominee or other third party, in any property, real or personal. The defendant agrees to assist the United States in identifying, locating, returning, and transferring assets for use in payment of restitution, forfeiture and fines ordered by the Court. The defendant agrees to

complete a financial statement fully and truthfully within 30 days after the entry of this Plea Agreement. The defendant further agrees to execute any releases that may be necessary for the United States to obtain information concerning the defendant's assets. The defendant agrees that, at the discretion of the U.S. Attorney's Office, the defendant will submit to one or more interviews or depositions under oath regarding financial issues prior to sentencing.

12. **Forfeiture.** The defendant agrees to forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) in conjunction with 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the wire fraud scheme charged in Count 1 of the Superseding Indictment.

The defendant agrees that all real and personal property identified in paragraphs a. to z. and aa. to ii of the Superseding Indictment is subject to forfeiture because it constitutes or is derived from proceeds traceable to the wire fraud scheme charged in Count 1 of the Superseding Indictment.

The defendant consents to entry of a preliminary order of forfeiture that includes a money judgment forfeiture that will become final with respect to the defendant at the time of sentencing. The defendant agrees that the amount of the money judgment forfeiture shall be $19,673,794 unless the Court reduces that sum based on the following objection, which the defendant reserves:

(1) Defendant asserts that he is entitled to a reduction in, or credit against the money judgment forfeiture for income taxes he paid as a result of the grain he sold, which he had fraudulently represented as being organic;

The United States opposes the requested reduction in the defendant's money judgment forfeiture. The defendant waives all defenses to the requested money

judgment forfeiture except for the objection(s) set forth above, which are expressly reserved through this Plea Agreement.

The defendant shall receive a credit against this money judgment forfeiture amount for the net forfeited value of each asset that is forfeited from him in connection with this case. The defendant shall also receive a credit against this money judgment forfeiture amount for the amounts paid to the United States for forfeiture from his 2023 farming profits.

The defendant agrees to forfeit to the United States, pursuant to 21 U.S.C. § 853(p), the property identified in Exhibit A to this Plea Agreement as substitute property to the extent the money judgment forfeiture imposed by the Court is not satisfied from the net proceeds of the directly forfeitable property described above.

The United States reserves its right to forfeit additional directly forfeitable property and additional substitute assets up to the amount of the money judgment forfeiture.

The parties agree that the defendant may specify the priority order in which all forfeitable assets other than financial accounts will be liquidated to satisfy the money judgment forfeiture.

The defendant waives all statutory and constitutional defenses to the forfeiture and waives any right to contest or challenge (including direct appeal, habeas corpus, or any other means) such forfeiture on any grounds except for those expressly set forth above. To the extent the defendant has sought remission or otherwise challenged the forfeiture of the above-described property, he withdraws any such challenges.

13. **Agreement for Use of Property.** The parties agree the defendant may use the seized farming equipment that is currently stored at his property to continue his farming operations for the 2023 season pursuant to all of the requirements in the Court's previous restraining order. The defendant explicitly agrees to allow the U.S. Marshals Service the right to inspect the property at any time by providing them with unrestricted access to the property, including a key or similar mode of entry into any outbuildings in which the equipment is stored. In exchange for the ability to continue using the property, the defendant agrees to pay 50% of his net profits from the 2023 farming season to the United States. This includes all net profits from the defendant's own farming and any amounts he is paid or otherwise receives or is reimbursed for any farming operations on any land the defendant owns or leases. To facilitate these payments, the defendant agrees to timely disclose to the United States all sales, payments, and expenses for his 2023 farming operations. The defendant agrees to make timely payments to the U.S. Marshals Service in the manner directed by the Marshals Service. The defendant also waives any claims against the United States, including its agencies, agents and contractors, for any alleged damage to the seized property, including any damage allegedly suffered as a result of its seizure, transportation, return, and storage.

The defendant agrees the United States may forfeit the money paid over to it as a result of this paragraph as substitute assets in partial satisfaction of the money judgment forfeiture.

14. **Waivers.** The defendant understands that by pleading guilty he waives his right to a trial or appeal on the question of his guilt or innocence and any order of

the Court relating to his use of forfeitable property. The defendant expressly waives the right to petition under 28 U.S.C. § 2255, except for a post-conviction attack based on a claim of ineffective assistance of counsel. The defendant waives all rights to obtain, directly or through others, information about the investigation and prosecution of this case under the Freedom of Information Act ("FOIA") and the Privacy Act of 1974, 5 U.S.C. §§ 552, 552A. The defendant has discussed these rights with the defendant's attorney and understands and waives these rights knowingly, intelligently, and voluntarily.

15. **Complete Agreement.** This is the entire agreement between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

ANDREW M. LUGER
United States Attorney

Dated: May 12, 2023

BY: ROBERT M. LEWIS
QUINN ASKEW
CRAIG R. BAUNE
Assistant U.S. Attorneys

Dated: May 12, 2023

JAMES CLAYTON WOLF
Defendant

Dated: May 12, 2023

PAUL ENGH, ESQ.
DAVID HASHMALL, ESQ.
Attorneys for Defendant

11

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 22-137 (KMM/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>  )<br>Plaintiff,   )<br>  )<br>v.   )<br>  )<br>(1) JAMES CLAYTON WOLF,   )<br>  )<br>Defendant.   ) | EXHIBIT A TO<br>PLEA AGREEMENT AND<br>SENTENCING STIPULATIONS |

The United States and the defendant identify the following substitute assets which are subject to forfeiture pursuant to 21 U.S.C. § 853(p) to the extent the money judgment forfeiture imposed by the Court is not satisfied from the net proceeds of the directly forfeitable property identified in paragraphs a. to z. and aa. to ii of the Superseding Indictment:



a.  Real property identified as the West one-half (W 1/2) of the Northwest Quarter (NW 1/4) of Section Eight (8), Township One Hundred Seven (107) North, Range Thirty-Five (35) West, Cottonwood County, Minnesota (Parcel ID No. 06-008-0100) (80 acres from Polzin);

b.  Real property identified as the Southwest Quarter of the Southeast Quart of the Southwest Quarter of the Southwest Quarter (SW1/4 SE1/4 SW1/4 SW1/4), the Southwest Quarter of the Southwest Quarter of the Southwest Quarter (SW1/4 SW1/4 SW1/4), and the Northwest Quarter of the Southeast Quarter of the Southwest Quarter of the Southwest Quarter (NW1/4 SE1/4 SW1/4 SW1/4), all in Section Six (6), Township one Hundred Seven (107), Range Thirty-five (35), Cottonwood County, Minnesota, (Parcel ID No. 06-006-0300) (49080 270th Street, Jeffers, MN);

c.  Real property identified as the West Half of the Northeast Quarter (W ½ of NE ¼), Section One (1), Township One Hundred Seven (107), Range Thirty-five (35), Cottonwood County, Minnesota (Parcel ID No. 06-001-0300) (80 acres from Berger Estate/Comfrey 80);

d. Real property identified as the Northwest Quarter of Section 32, Township 107, Range 35, Cottonwood County, Minnesota (Parcel ID No. 06-032-0200) (154 acres from Ann Millard);

e. Real property identified as the Northwest Quarter (NW 1/4) of Section Twenty-four (24), Township One Hundred Seven (107), Range Thirty-six (36), excepting the following described parcels:

That part of the South Half of the Northwest Quarter (S 1/2 NW 1/4) of Section Twenty-four (24), Township One Hundred Seven (107) North, Range Thirty-six (36) West, Cottonwood County, Minnesota, described as follows:

Commencing at the West Quarter corner of said Section 24; thence on an assumed bearing of North 0 degrees 00 minutes East, along the west line of said section, a distance of 296.00 feet to the point of beginning of the tract to be described; thence continuing North 0 degrees 00 minutes East, along said west line, a distance of 749.00 feet to an iron monument; thence North 90 degrees 00 minutes East a distance of 77.00 feet to an iron monument; thence South 19 degrees 30 minutes East a distance of 84.00 feet to an iron monument; thence South 60 degrees 30 minutes East a distance of 579.00 feet to an iron monument; thence North 83 degrees 25 minutes East a distance of 766.00 feet to an iron monument; thence North 35 degrees 57 minutes East a distance of 47.00 feet to an iron monument; thence North 8 degrees 33 minutes West a distance of 175.00 feet to an iron monument; thence North 84 degrees 25 minutes East a distance of 1285.66 feet to an iron monument located on the north-south quarter line of said section; thence South 0 degrees 04 minutes 36 seconds West, along said north-south quarter line, a distance of 1114.72 feet to the Center of said section; thence North 89 degrees 47 minutes 01 seconds West, along the east-west quarter line of said section, a distance of 1791.93 feet to an iron monument; thence North 46 degrees 37 minutes East a distance of 183.42 feet to an iron monument, thence North 1 degree 53 minutes West a distance of 163.00 feet to an iron monument; thence North 89 degrees 29 minutes West a distance of 252.00 feet to an iron monument; thence South 51 degrees 15 minutes West a distance of 63.00 feet to an iron monument; thence South 79 degrees 47 minutes West a distance of 58.00 feet to an iron monument; thence North 89 degrees 04 minutes West a distance of 55.00 feet to an iron monument; thence North 72 degrees 55 minutes West a distance of 57.00 feet to an iron monument; thence North 50 degrees 37 minutes West a distance of 53.00 feet to an iron monument; thence North 89 degrees 13 minutes West a distance of 397.00 feet to an iron monument; thence continuing North 89 degrees 13 minutes West a

distance of 80.00 feet to the point of beginning, containing 49.31 acres, subject to easements now of record in said county and state.

and

Part of the Northwest Quarter of the Northwest Quarter (NW 1/4 NW 1/4) of Section Twenty-four (24), Township One Hundred Seven (107) North, Range Thirty-six (36) West in Amboy Township, Cottonwood County, Minnesota, described as follows:

Beginning at the Northwest corner of said Northwest Quarter, thence South 89 degrees 33 minutes 49 seconds East, assumed bearing, along the North line of said Northwest Quarter, a distance of 335.87 feet; thence South 00 degrees 00 minutes 00 seconds East, a distance of 362.84 feet; thence North 90 degrees 00 minutes 00 seconds East, a distance of 187.00 feet; thence South 00 degrees 00 minutes 00 seconds East, a distance of 377.60 feet; thence North 89 degrees 06 minutes 30 seconds West, a distance of 525.51 feet, to a point on the West line of said Northwest Quarter, thence North 00 degrees 12 minutes 06 seconds East, along the West line of said Northwest Quarter, a distance of 734.83 feet to the point of beginning. Said tract contains 7.31 acres and is subject to existing highway and road easement and other easements of record, if any. (Parcel ID Nos. 01-024-0102 and 01-024-0103) (approximately 100 acres from Conrad);

f. The real property identified as the East Half of the Northwest Quarter (E ½ NW ¼) of Section Twelve (12), Township One Hundred Seven (107) North, Range Thirty-seven (37) West of the 5th P.M. in Cottonwood County, Minnesota (Parcel ID No. 17-012-0500) (80 acres from Schoper);

g. The real property identified as the Northwest Quarter of Section 28, Township 107 North, Range 35 West, Cottonwood County, Minnesota, EXCEPT the following:

The rights of Delton Township in 1½ acres in the Northwest corner thereof described as follows, to-wit: Beginning at the Northwest corner of said Section 28; thence East 16 rods along the North side of said Section 28; thence South 15 rods; thence West 16 rods parallel with said North line of said Section to the West line of said Section; thence 15 rods North along the West line of said Section to the point of beginning, and also excepting:

The land vested in the State of Minnesota by virtue of a Warranty deed dated May 29, 1962 and recorded in the office of the Register of Deeds

       for said Cottonwood County in Book 94 on Page 305 and, by virtue of a Final Certificate in highway condemnation proceedings in the District Court for said county dated August 31, 1967 and recorded in said office in File 150, Card 801 (Parcel ID No. 06-028-0200) (158.5 acres from Stroud);

h.     The real property identified as the South One-Half of the Northeast Quarter of Section 7, Township 107 North of Range 35 West of the 5th P.M., containing 80 acres more or less (Parcel ID No. 06-007-0101) (80 acres referred to as the "Bin 80"); and

i.     The real property identified as the North Half of the Southeast Quarter (N ½ of SE ¼), Section Seven (7), Township One Hundred Seven (107) North, Range Thirty-five (35) West, Cottonwood County, Minnesota (Parcel ID No. 06-007-0404) (approximately 75 acres referred to as the "Hog Barn 80").